## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **NULFCO., INC.** | : | **CASE NO.:** |
| **365 Taggart Road** | : | |
| **Darlington, PA 16115-2321** | : | |
| | : | **COMPLAINT** |
| **And** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **LAG POOLS, LLC** | : | |
| **267 Taggart Road** | : | |
| **Darlington, PA 16115-2399** | : | |
| | : | |
| **And** | : | |
| | : | |
| **MCKAY AND GOULD DRILLING, INC.** | : | |
| **267 Taggart Road** | : | |
| **Darlington, PA 16115-2399** | : | |
| | : | |
| **And** | : | |
| | : | |
| **CINDY GOULD** | : | |
| **d/b/a UNFORGETTABLE** | : | |
| **267 Taggart Road** | : | |
| **Darlington, PA 16115-2399** | : | |
| | : | |
| **And** | : | |
| | : | |
| **EAST PALESTINE AERIE NO. 1506** | : | |
| **FRATERNAL ORDER OF EAGLES, INC.** | : | |
| **320 E Taggart St** | : | |
| **East Palestine, OH 44413-2456** | : | |
| | : | |
| **And** | : | |
| | : | |
| **FOIN LLC** | : | |
| **d/b/a MGM-WBA** | : | |
| **a/k/a WRISTBANDS AMERICA** | : | |
| **d/b/a CRAZY LAZER** | : | |
| **167 E Taggart St** | : | |
| **East Palestine, OH 44413** | : | |
| | : | |
| **And** | : | |
| | : | |
| **FLAGS, SPECIALTIES, ETC.** | : | |
| **d/b/a FLAGS & SPECIALTIES** | : | |

**167 E Taggart St**                                   :
**East Palestine, OH 44413**                           :
                                                  :
**And**                                                :
                                                  :
**JONATHAN D. WEST**                                    :
**576 E Martin St**                                     :
**East Palestine, OH 44413**                           :
                                                  :
**And**                                                :
                                                  :
**CHRISTIAN HOUSE HOME**                                :
**HEALTH OH LLC**                                       :
**82 Garfield Ave**                                     :
**East Palestine, OH 44413**                           :
                                                  :
**And**                                                :
                                                  :
**CHRISTIAN HOUSE LLC**                                 :
**CHRISTIAN HOUSE ASSISTED LIVING** :
**82 Garfield Ave**                                     :
**East Palestine, OH 44413**                           :
                                                  :
**And**                                                :
                                                  :
**CHRISTIAN HOUSE REALTY LLC**                          :
**82 Garfield Ave**                                     :
**East Palestine, OH 44413**                           :
                                                  :
**And**                                                :
                                                  :
**MALLORY LYDA THOMPSON**                               :
**611 E Taggart St**                                    :
**East Palestine, OH 44413**                           :
                                                  :
**And**                                                :
                                                  :
**JOSEPH E. THOMPSON**                                  :
**611 E Taggart St**                                    :
**East Palestine, OH 44413**                           :
                                                  :
**And**                                                :
                                                  :
**M. THOMPSON, a minor child**                          :
**611 E Taggart St**                                    :
**East Palestine, OH 44413**                           :

|                                              |   |
|----------------------------------------------|:--|
| **And**                                      | : |
|                                              | : |
| **E. THOMPSON, a minor child**               | : |
| **611 E Taggart St**                         | : |
| **East Palestine, OH 44413**                 | : |
|                                              | : |
| **And**                                      | : |
|                                              | : |
| **STACEY D. SEVACKO**                        | : |
| **8494 High Street Northeast**               | : |
| **Warren, OH  44484**                        | : |
|                                              | : |
| **And**                                      | : |
|                                              | : |
| **DRENNEN SEVACKO**                          | : |
| **8494 High Street Northeast**               | : |
| **Warren, OH  44484**                        | : |
|                                              | : |
| **And**                                      | : |
|                                              | : |
| **K. SEVACKO, a minor child**                | : |
| **8494 High Street Northeast**               | : |
| **Warren, OH  44484**                        | : |
|                                              | : |
| **And**                                      | : |
|                                              | : |
| **J. SEVACKO, a minor child**                | : |
| **8494 High Street Northeast**               | : |
| **Warren, OH  44484**                        | : |
|                                              | : |
| **Plaintiffs,**                              | : |
|                                              | : |
| **v.**                                       | : |
|                                              | : |
|                                              | : |
| **NORFOLK SOUTHERN**                         | : |
| **CORPORATION,**                             | : |
|                                              | : |
| **Serve:**                                   | : |
| **Corporation Service Company**              | : |
| **3366 Riverside Drive, Suite 103**          | : |
| **Upper Arlington, Ohio  43221**             | : |
|                                              | : |
| **And**                                      | : |
|                                              | : |

**NORFOLK SOUTHERN RAILWAY** :
**COMPANY,** :
 :
**Serve:** :
**Corporation Service Company** :
**3366 Riverside Drive, Suite 103** :
**Upper Arlington, Ohio  43221** :
 :
           **Defendants.** :

## COMPLAINT

Plaintiffs, by and through counsel, allege as follows:

## I.        NATURE OF THIS ACTION

1.       This action arises out of a train derailment (the "Derailment") that took place in East Palestine, Ohio, in close proximity to the Pennsylvania border.  The Plaintiffs NulfCo., Inc., LAG Pools, LLC, McKay and Gould Drilling, Inc., and Cindy Gould d/b/a Unforgettable, a sole proprietorship, are each businesses that have their principal place of business in Pennsylvania. They are citizens of Pennsylvania, and they allege herein that they have each sustained damages in Pennsylvania as a result of the actions and inactions of the Defendants.

2.       The Plaintiffs East Palestine Aerie No. 1506 Fraternal Order Of Eagles, Inc., FOIN LLC d/b/a MGM-WBA a/k/a Wristbands America d/b/a Crazy Lazer, Flags, Specialties, Etc. d/b/a Flags & Specialties, Jonathan D. West, Christian House Home Health OH LLC, Christian House LLC, Christian House Assisted Living, Christian House Realty LLC, Mallory Lyda Thompson, Joseph E. Thompson, M. Thompson (a minor), E. Thompson (a minor), Stacey D. Sevacko, Drennen Sevacko, K. Sevaco (a minor) and J. Sevaco (a minor), are all citizens and/or residents of Ohio, and the business Plaintiffs have their principal place of business in Ohio.  They have each sustained damages in Ohio as a result of the actions and inactions of the Defendants.

3.      As alleged hereafter, the damages sustained by the above named Plaintiffs in the Commonwealth of Pennsylvania and/or in the state of Ohio, were caused by the actions and inactions of the Defendants in this District and Division.

4.      Defendant, Norfolk Southern Corporation, is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia, with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.  Norfolk Southern Corporation is not a citizen of Ohio nor a citizen of Pennsylvania.

5.      Defendant, Norfolk Southern Railway Company, is a wholly owned subsidiary of Norfolk Southern Corporation. Norfolk Southern Railway Company is a Class I railroad corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia, with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308. Norfolk Southern Railway Company is not a citizen of Ohio nor a citizen of Pennsylvania.

## II.      JURISDICTION AND VENUE

6.      Federal jurisdiction in this case is based upon diversity of citizenship and amount. There is complete diversity between the Plaintiffs and the Defendants in this case.  Each Plaintiff's damages in this case exceeds the sum of $75,000.00 exclusive of interest and costs.

## III.      THE DERAILMENT AND RESULTING TOXIC EVENTS

7.      Plaintiffs incorporate by reference each and every allegation set forth above.

8.      On February 3, 2023, at approximately 9:00 p.m., eastbound Norfolk Southern[1] freight train 32N derailed in East Palestine, Ohio.

---

[1] The Defendants will be jointly referred to hereafter as "Norfolk Southern" or as "Defendants."

9.      While the derailed cars were located in Ohio, they were near the Pennsylvania border, and thus, the derailed tank cars were situated in the vicinity of the businesses operated by some of the Plaintiffs.

10.     On February 14, 2023, the National Transportation Safety Board ("NTSB") issued a preliminary Investigative Update regarding the Derailment, stating in part:

> On Feb. 3, at approximately 8:54 p.m., local time, eastbound Norfolk Southern Railway, general merchandise freight train 32N, derailed on main track 1 in East Palestine, Ohio. As a result of the derailment, 38 rail cars derailed and a fire ensued which damaged an additional 12 cars. There were 20 total hazardous material cars in the train consist – 11 of which derailed.[2]

11.     The 11 derailed railway cars contained toxic, hazardous, and/or otherwise harmful chemicals and materials, including vinyl chloride, dipropylene glycol, diethylene glycol, ethylene glycol monbutyl ether, polyvinyl, polypropyl glycol, isobutylene, butyl acrylates, petro oil, and benzene.

12.     The amounts released included 688,000 pounds of polyvinyl, 273,394 pounds of ethylhexyl acrylate, 273,394 pounds of ethylene glycol monobutyl ether, 206,000 pounds of butyl acrylates, and 1,109,400 pounds of vinyl chloride.

13.     These chemicals and materials leaked from the railcars onto the ground, into the air, and into nearby waterways in the state of Ohio and in the Commonwealth of Pennsylvania.

14.     The pressure in one or more of the railcars containing vinyl chloride could not be released due to malfunctioning safety pressure relief valves that were owned, operated, and/or maintained by Norfolk Southern.

15.     Fearing a massive explosion, governmental authorities ordered an evacuation in a one-mile by two-mile area surrounding East Palestine, including parts of both Ohio and

---

[2] *See* https://www.ntsb.gov/news/press-releases/Pages/NR20230214.aspx

Pennsylvania; the evacuation area included the Plaintiffs' properties and businesses in both Ohio and Pennsylvania.

16.     Norfolk Southern proposed and then conducted, by and through its agents and/or employees, a so called "controlled" explosion of five (5) tanker cars in order to breach these railcars and vent/drain the chemicals onto/into the ground, in a nearby ditch.

17.     Norfolk Southern proposed and then proceeded, by and through its agents and/or employees, to turn the ground and ditch area where the chemicals had been vented/drained into a makeshift toxic burn pit.

18.     Norfolk Southern proposed and then proceeded, by and through its agents and/or employees, to burn the toxic, hazardous, and dangerous chemicals and materials, including five (5) tanker cars that contained more than 1,000,000 pounds of vinyl chloride, which further caused toxic, hazardous, dangerous chemicals and materials to be released onto/into the ground, into the surface and subsurface waters, and into the air in East Palestine and surrounding areas.

19.     Vinyl chloride is extremely toxic and hazardous and can cause mutation of DNA. Exposure is associated with increased risk of cancers, including liver cancer.

20.     When the vinyl chloride was released and burned, it discharged other toxic, hazardous, and dangerous chemicals, including but not limited to dioxins, phosgene, hydrogen chloride (hydrochloric acid), benzene and unsaturated hydrocarbons into the air.  Phosgene is a highly toxic gas that was used as a chemical weapon in World War I.  Hydrogen chloride is a harmful chemical, causing skin, eye, nose, and throat irritation upon exposure.

21.     These released chemicals and materials (from both the initial Derailment and the subsequent toxic burn pit) have seeped into the air, surface and sub-surface soil, surface and sub-surface waters, streambeds, riverbeds, and groundwaters, and spread through the air and

waterways for hundreds, if not thousands, of miles, including into the Ohio River. These chemicals and materials were all dumped onto Plaintiffs' buildings, soil, land, and water supply.

22.     All of the above occurred in close proximity to the properties and businesses of the Plaintiffs.[3]

## IV.     THE CAUSE OF THE DERAILMENT – NORFOLK SOUTHERN ABANDONS SAFE OPERATING PRACTICES

23.     Plaintiffs incorporate by reference each and every allegation set forth above.

24.     For approximately five years prior to the Derailment, Norfolk Southern had been implementing a number of operational changes that directly prioritized profits over safety through the use of a strategy known as "Precision Scheduled Railroading" ("PSR").

25.     PSR is used to refer to operational changes designed to decrease operating costs. The operational changes associated with PSR include reductions in staff; longer, heavier trains; tighter schedules; and reductions in assets, such as locomotives. At its core, PSR mandates that trains should transport larger and heavier loads, in less time, with fewer workers performing onsite operation and safety procedures.

26.     In 2019, Norfolk Southern laid out its three-year transformational plan to implement PSR (referred to as the "Thoroughbred Operating Plan" or "TOP21"). TOP21 included centralizing operations; reducing staff; running fewer, heavier, faster trains; and optimizing Norfolk Southern's network in order to increase efficiency.

27.     At its core, PSR was Norfolk Southern's plan to cut jobs, cut costs, cut safety, and increase risks – all so Norfolk Southern could increase its profits.

---

[3] The property of Plaintiff NulfCo, Inc. was so close to the Derailment site that Norfolk Southern, while engaged in the cleanup of that site, rented part of NulfCo, Inc.'s property for the storage of materials.

28.     Upon information and belief, these same or similar operating changes were in place at the time of the Derailment and subsequent explosion, particularly as several key metrics leading up to the Derailment showed a dramatic reduction in Norfolk Southern's workforce, a reduction in train engineers/operators, an increase in its trains' average speed, and a resulting sharp increase in company profits, as these operational and safety cuts were enacted.

29.     Norfolk Southern identified its "Operating Ratio" as the key metric to measure its progress.  Operating Ratio was to be calculated by dividing its operating expenses by its operating revenues.   In essence, Norfolk Southern sought to significantly increase revenues by cutting otherwise reasonable safety and operational costs.  Norfolk Southern set a goal of reducing its Operating Ratio to 60% by 2021 (it was then running at 65.4%).  Norfolk Southern also changed its executive compensation in 2019, tying approximately 80% of the compensation to PSR objectives, including Norfolk Southern's Operating Ratio.

30.     In furtherance of these goals, Norfolk Southern executives set a tight deadline to complete its transition, namely full PSR implementation by 2021.  This required the railroad to cut headcount by 500 railway workers in 2019 and 3,000 by 2021.

31.     In 2019, Norfolk Southern put out a statement regarding its PSR overhaul, stating, "[w]e set company records for train speed, which improved 17% year-over-year, and terminal dwell, which was down 30%[.]"

32.     According to Association of American Railroads ("AAR") and Surface Transportation Board ("STB") data, the average operating ratio for Class I railroads decreased from 73% in 2011 to 62% in 2021, reflecting an increase in net revenue of about 58% – from almost $18 billion to more than $28 billion – over the same period.

33.     By 2022, Norfolk Southern had cut even deeper into its workforce, employing an average of only about 19,000 railway workers compared with about 27,000 workers only five years earlier – a reduction of nearly 30% of its workforce.  These reductions directly and proximately resulted in reduced operational safety for Norfolk Southern trains and increased risk to Plaintiffs.

34.     Norfolk Southern's executives earned millions of dollars in awards as Norfolk Southern's Operating Ratio and headcount dropped each year.  In 2021, when Norfolk Southern hit a record low Operating Ratio, it helped then-CEO Squires land nearly $3.5 million in cash bonuses – almost three times what he had earned just the year before.  At least four other executives received more than a million dollars each in similar incentive-based bonuses, including the recently fired CEO Shaw, who was an executive vice president at the time.  Tellingly, in the Proxy Statement the company filed with the SEC on March 31, 2022, Norfolk Southern highlighted its 2021 "record performance for train length and weight" as partial justification for why its executives earned a cash payout that year.

35.     Plaintiffs have a good faith belief, and therefore allege, that Norfolk Southern's PSR program was a substantial factor in contributing to the Derailment and the damages to the Plaintiffs resulting therefrom.

## V.     THE HOTBOX DETECTORS ARE IGNORED

36.     Plaintiffs incorporate by reference each and every allegation set forth above.

37.     As Norfolk Southern Train 32N was approaching East Palestine, Ohio, it passed by certain hot box detectors ("HBDs") which are warning devices that Norfolk Southern had employed along the route.

38.    The purpose of an HBD is to assess the temperature conditions of railcar wheel bearings while in route and to provide a warning if dry or faulty bearings are generating excess heat.

39.    Norfolk Southern sets its own standards, policies and procedures for the placement of HBDs, as well as the alarm thresholds for above ambient temperature readings.

40.    Norfolk Southern Train 32N passed three HBDs before the Derailment.

41.    At milepost 79.9, Train 32N passed over a Norfolk Southern HBD, and the suspect wheel bearing from railcar number 23 had a recorded temperature of 38°F above ambient.

42.    When Train 32N passed the next Norfolk Southern HBD, at milepost 69.01, the suspect wheel bearing from railcar number 23 had a recorded temperature of 103°F above ambient and was visibly already on fire.

43.    When Train 32N passed the next Norfolk Southern HBD, at milepost 49.81, the suspect wheel bearing from railcar number 23 had a recorded temperature of 253°F above ambient. So, in a distance of 30 miles, the recorded temperature generated by the wheel bearing area of railcar number 23 had increased by over 200°F.

44.    The hotbox reading of 253°F above ambient resulted in an alarm message, instructing crew to slow and stop the train to inspect the hot axle.  The previous above ambient temperature warnings had not generated similar alarm messages.  The engineer applied the train's dynamic brake, but it was already too late.  This malfunctioning railcar axle is consistent with an overheated wheel bearing, which ultimately caused the train to derail and trigger the application of the emergency brakes as the train passed through East Palestine.

45.    Norfolk Southern's intentional or grossly negligent failure to monitor and/or timely react to the information provided by the HBDs was a substantial factor in causing the Derailment

and causing the damage to the Plaintiffs herein, as well as to many other citizens, residents, and businesses in and around East Palestine, Ohio and neighboring areas in Pennsylvania.

## VI.   THE ENVIRONMENT AROUND THE PLAINTIFFS' HOMES AND BUSINESSES BECOMES TOXIC

46.     Plaintiffs incorporate by reference each and every allegation set forth above.

47.     Eleven of the derailed cars on Norfolk Southern Train 32N carried hazardous materials, and five of them contained vinyl chloride.

48.     All told, the derailed cars of Train 32N were carrying over 1,600,000 pounds of toxic and hazardous chemicals.

49.     During and after the Derailment, the hazardous chemicals – including, but not limited to, vinyl chloride, butyl acrylate, benzene residue, ethylene glycol monobutyl ether, ethylhexyl acrylate, and isobutylene – ignited, and the resulting fire continued to burn with increasing intensity from February 3 - 6, 2023.

50.     Given the ongoing release of toxic and hazardous chemicals from the Derailment, at approximately 11:00 p.m. on February 3, 2023, officials issued a shelter-in-place order for the entire town of East Palestine.

51.     On February 4th, "[r]esponding crews discovered contamination runoff on two surface water streams:  Sulphur Run and Leslie Run."[4]  It was also noted that the runoff "impacted aquatic life."  The Ohio Department of Natural Resources has since reported that wildlife officials located approximately 3,500 dead fish in Leslie Run, Bull Creek, and the North Fork of Little Beaver Creek.

---

[4] https://response.epa.gov/site/site_profile.aspx?site_id=15933.

52.     As first responders battled the blaze from February 3 - 5, 2023, one railcar carrying vinyl chloride became a focus of concern when its emergency safety valves malfunctioned, and pressure started building to unsafe levels within the railcar's steel shell.

53.     On Sunday, February 5th, first responders and others learned of "a drastic temperature change in a railcar, and there [was] the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile."  Local officials and Ohio Governor Mike DeWine issued an evacuation order on the evening of February 5th for anyone living within a mile of the Derailment site.

54.     These concerns were amplified when, on Monday, February 6, 2023, a drastic temperature change took place within the railcar with the malfunctioning safety valves, increasing the potential of a catastrophic tanker failure and explosion, and causing local officials to expand the evacuation area based on "new modeling information."

55.     Upon information and belief, Norfolk Southern reported to federal, state and local officials that the only way to avoid a catastrophic tanker failure and explosion was to conduct a "controlled release" of the vinyl chloride in the compromised tanker.

56.     The "controlled release" called for Norfolk Southern and/or its contractors to detonate explosive charges on the compromised vinyl chloride tanker, so as to dump the vinyl chloride out of the tanker and into a trench where it would be lit on fire.

57.     Although the concern related to only one of the vinyl chloride cars, at 4:30 p.m. on Monday, February 6, 2023, Norfolk Southern and/or its contractors intentionally blew holes in not just the one tanker car of concern, but all five derailed railcars containing vinyl chloride.

58.     The "controlled release" was anything but controlled.  Once the charges were detonated on the five vinyl chloride cars, there was a large, fiery explosion that released a huge plume of thick black smoke forming a mushroom cloud over the entire area.

59.     The toxic mushroom cloud was caused by a temperature and weather inversion over the Derailment site, which allowed the explosion to disperse dozens of toxic chemicals and combustion byproducts, including hydrogen chloride and phosgene gas, for miles.

60.     More specifically, the smoke and particulate plume from the "controlled release" were trapped from rising higher into the atmosphere due to an inversion layer in the atmosphere, where it was unable to continue to rise vertically, so it began to spread out horizontally in a thick cloud cover.

61.     Upon information and belief, the smoke and particulate plume from the "controlled release" eventually traveled a total of 30 miles in each direction from the Derailment site, contaminating the air, surfaces, soil and water, causing damage to the Plaintiffs herein, all of whom live and/or own businesses within approximately two miles of the Derailment site.

62.     On March 22, 2023, the NTSB Chair characterized the Derailment as "100% preventable" in her testimony before the U.S. Senate Environment and Public Works Committee.

63.     The environmental harm resulting from the Derailment of Train 32N has been nationally publicized.  This publicity has stigmatized the Plaintiffs' real property and the Plaintiffs' businesses located in and around East Palestine, both in Pennsylvania and Ohio, causing the Plaintiffs substantial damages both in terms of loss in value and loss in income.

### VII.    THE RELEASE OF HAZARDOUS CHEMICALS

64.     Plaintiffs incorporate by reference each and every allegation set forth above.

65.     Numerous hazardous chemicals and combustion products were detected in air, water, soil and sediment samples taken within a 30-mile radius of the Derailment site following the "controlled release," along with the health and environmental effects associated with each. These chemicals are harmful to humans, and may cause a direct effect on livestock, plants and crops, as well as an indirect effect on the food supply:

- Vinyl Chloride
- Dioxins
- Ethylene Glycol Monobutyl Ether
- Isobutylene
- Benzene
- Butyl Acrylate

- Ethylhexyl Acrylate
- Diethylene Glycol
- Hydrogen Sulfide
- Hydrogen Cyanide
- Phosgene
- Hydrogen Chloride

Exposure to any or all of these chemicals can be harmful to humans.

## VIII.   PLAINTIFFS' CAUSES OF ACTION

## COUNT I – NEGLIGENCE AND NEGLIGENCE PER SE

66.     Plaintiffs incorporate by reference each and every allegation set forth above.

67.     The Derailment, fire, "controlled release" of toxic chemicals, and explosion of toxic chemicals were caused by the negligence, carelessness and/or recklessness of the Defendants.

68.     In addition, and in the alternative, the Derailment, fire, release and explosion of toxic chemicals were caused by defective, unfit and/or unsafe equipment, which was in the care, custody and control of Defendants.  Defendants knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

69.     Defendants owed Plaintiffs a duty to use reasonable care in the transportation of hazardous materials through East Palestine, Ohio.  Consistent with federal regulations and industry practices and procedures, these duties include, but are not limited to, the duty to:

a.      Properly inspect their trains and railcars;

b.      Not place in service or continue in service a car with an overheated roller bearing;

c.      Not accept or transport any shipment of hazardous material that has pressure relief devices made of materials that are incompatible with the lading;

d.      Maintain vigilant lookout during the operation of its trains and railcars;

e.      Remedy defects in equipment and remove all cars that are unsafe to run;

f.      Immediately notify train dispatchers about fires observed on roller bearings and the extent to which fires have spread beyond the roller bearing;

g.      Properly calibrate, maintain, test and operate train braking systems;

h.      Properly develop and implement risk reduction programs;

i.      Properly develop and implement risk-based hazard management programs;

j.      Properly develop and implement safety performance evaluation processes;

k.      Operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue and other combustible or hazardous liquids;

l.      Utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors;" appropriately place such detectors to ensure timely alerting of any potential problems; implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and ensuring that such detectors are timely and properly inspected and maintained;

m.      Ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

n.      Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

o.      Ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

p.      Prevent over-loading the train with too many railcars or materials;

q.      Load the railcars consistent with accepted practice;

r.      Load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

s.      Adequately staff positions that plan, prepare, coordinate and oversee transportation of hazardous materials by railcar;

t.      Hire, train, manage, oversee and supervise their agents, servants and employees, including but not limited to the train engineer and dispatcher, concerning the operation of Train 32N on February 3, 2023;

u.      Train their agents, servants and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

v.      Properly determine the adequacy and skill of their agents, servants and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

w.      Ensure that their agents, servants and employees, including but not limited to the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

x.      Properly instruct and adequately train their agents, servants and employees, including but not limited to the train engineer and dispatcher, concerning safety and emergency procedures in the event of a possible derailment;

y.      Route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.      Adequately warn those in danger of imminent exposure to hazardous chemicals;

aa.     Institute proper procedures and training for response to the mechanical malfunction of a railcar;

bb.     Institute proper procedures and training for response to derailment of railcars containing hazardous materials;

cc.     Institute proper procedures to avoid exposing hazardous materials to the environment;

dd.    Have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property and persons in the event of derailment;

ee.    Timely implement such an emergency response plan;

ff.    Transport and handle hazardous materials in a manner which would not cause Plaintiffs harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct;

gg.    Properly dispose of, or otherwise eliminate, the hazardous materials from the Derailment site, including avoiding the use of techniques that would further expose Plaintiffs and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

hh.    Evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

ii.    Timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

jj.    Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

kk.    Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

ll.    Contain the spread of hazardous materials and byproducts, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property and persons.

70.    However, inconsistent with federal regulations and industry practice and procedures, Defendants negligently, carelessly and/or recklessly breached their duties to Plaintiffs by failing to perform some or all of the duties outlined in the paragraph next above.

71.    Because the Defendants were transporting hazardous materials, which can be detrimental to the health and safety of humans, Defendants owed an extremely high duty of care to the Plaintiffs and others, commensurate with the risk of transporting such hazardous materials.

72.     Defendants owed and breached a duty of reasonable care commensurate with the release and burning of those hazardous materials, including the resultant release of phosgene and hydrogen chloride.

73.     Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendants had a duty to investigate the extent to which the "controlled release" and burn of hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts, including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, were contaminating property at levels that would materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

74.     The damages to Plaintiffs were also caused by or aggravated by the fact that Defendants failed to take necessary actions following the Derailment to mitigate the danger and harm associated with their operations.

75.     Additionally, the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20101 et seq., and its accompanying regulations are implemented to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents, 49 U.S.C. § 20101.  The Derailment that forms the basis of this lawsuit is currently under investigation by the NTSB.  Plaintiffs are currently unadvised of the full extent of the federal or state safety laws and regulations that Norfolk Southern or its agents may have violated but reserve the right to rely on such safety laws and regulations shown during discovery.  However, upon information and belief, Defendants' conduct violated one or more regulations, including but not limited to the following:

   a.     49 CFR Part 215, including but not limited to 49 CFR § 215.9, 49 CFR § 215.13, 49 CFR § 215.25, 49 CFR § 215.115, Appendix B of CFR Part 215, and Appendix D of 49 CFR Part 215.

   b.     49 CFR Part 229, including but not limited to 49 CFR § 229.7, and 49 CFR § 229.29.

     c.     49 CFR Part 232, including but not limited to 49 CFR § 232.103 and 49 CFR § 232.109.

     d.     49 CFR Part 271, including but not limited to 49 CFR § 271.101, 49 CFR § 271.103, 49 CFR § 271.211, and 49 CFR § 271.213.

     e.     49 CFR Part 174, including but not limited to 49 CFR § 174.3.

     f.     49 CFR Part 179, including but not limited to 49 CFR § 179.15.

76.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT II – STRICT LIABILITY

77.    Plaintiffs incorporate by reference each and every allegation set forth above.

78.    Defendants are strictly liable for the injuries and damages suffered by Plaintiffs pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

79.    At all times relevant to this action, Defendants were the owner and operator of Train 32N.

80.    At all times relevant to this action, Defendants had supervision, custody and control of Train 32N.

81.    At all times relevant to this action, Defendants owed and breached a duty of reasonable care to adequately address the spilled toxic and hazardous materials after the Derailment had taken place.

82.    At all times relevant to this action, Defendants were under a continuing duty to protect the Plaintiffs from the toxic and hazardous materials.

83.    The transportation of these toxic and hazardous materials, including but not limited to vinyl chloride, is an abnormally dangerous and/or ultra-hazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

84.     Defendants engaged in an abnormally dangerous and/or ultra-hazardous activity, for which common law strict liability applied, for transporting hazardous substances, which Defendants knew to be dangerous and failed to take proper precautions.

85.     Had Defendants not engaged in the abnormally dangerous and/or ultra-hazardous activity, Plaintiffs would not have had their property contaminated or exposed to dangerous levels of these toxic and hazardous materials, and they would not have endured the other damages set forth herein.

86.     The harm to Plaintiffs was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting toxic and hazardous materials in close proximity to residential, commercial and agricultural areas.

87.     Defendants' operations and toxic discharges were, and will remain, a substantial factor in causing harm to Plaintiffs.

88.     As a direct and proximate result of Defendants' acts or omissions in the course of conducting this abnormally dangerous and/or ultra-hazardous activity, Plaintiffs presently suffer, and will continue to suffer, property damage, out of pocket expenses, loss of the quiet use and enjoyment of property, diminution of property value, loss of business income, loss of business goodwill, and inconvenience and emotional distress.

89.     Defendants are strictly liable, jointly and severally, without regard to fault, for all damages to Plaintiffs, which were a direct and proximate result of the Derailment and release of toxic and hazardous materials that harmed Plaintiffs as described herein.

90.     Defendants' conduct, as alleged herein, shows that they acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant imposing punitive damages.

## COUNT III – PRIVATE NUISANCE

91.     Plaintiffs incorporate by reference each and every allegation set forth above.

92.     Defendants have created a condition that is harmful to the health of anyone utilizing Plaintiffs' property, thus interfering with the use and enjoyment of that property, causing displacement and business interruption, and causing Plaintiffs to suffer the injuries and inconvenience described herein.

93.     Plaintiffs have suffered, and will continue to suffer, injuries that are different from those experienced by the public generally, including the contamination of their property, the interference with their businesses and the use and enjoyment of their properties.

94.     The seriousness of the harm associated with Defendants' discharge of toxic and hazardous materials outweighs the public benefit of Defendants' conduct.

95.     Defendants knew or should have known that the toxic and hazardous materials they were transporting were harmful to individuals and real property, and that it was substantially certain that improper transportation, handling and disposal of such materials would cause injury to Plaintiffs and their property.

96.     Defendants knew or should have known that their post-Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to exacerbate the damages to Plaintiffs and the wider community.

97.     Defendants' contamination of Plaintiffs' property with toxic and hazardous substances has unreasonably and substantially interfered with their rights to use and enjoy their property.

98.     Defendants' contamination of Plaintiffs' property with toxic and hazardous substances has caused, and will continue causing, among other things, Plaintiffs to refrain from

(1) occupying or using their real properties, (2) being able to sell finished products that were contaminated, and (3) allowing employees to safely occupy and use their facilities. This has, in turn, caused significant loss of income, out of pocket expenses, diminution in property value and inconvenience.

99.     Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

100.    Plaintiffs, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious conduct, including the contamination of their property and interruption of virtually all of their ongoing business activity.

101.    Defendants' improper transportation and handling of toxic and hazardous materials, both before and after the Derailment itself, and the contamination of Plaintiffs' property resulting therefrom, constitutes a private nuisance.

102.    Defendants' improper transportation and handling of toxic and hazardous materials has directly and proximately caused Plaintiffs to presently suffer, and continue to suffer in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill and inconvenience.

103.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## **COUNT IV – PUBLIC NUISANCE**

104.    Plaintiffs incorporate by reference each and every allegation set forth above.

105.     Defendants' improper transportation and handling of toxic and hazardous materials has created conditions that are harmful to the health of anyone utilizing Plaintiffs' property, thus interfering with the use and enjoyment of that property, causing displacement and business interruption, and causing Plaintiffs to suffer the injuries and inconvenience described herein.

106.     As a result of Defendants' actions and/or inactions, Plaintiffs have suffered a permanent loss of use and enjoyment of their property.

107.     Defendants knew or should have known that the toxic and hazardous materials being transported were hazardous and harmful to real property and individuals, and they were substantially certain that improper transportation and handling of these materials were hazardous and harmful to property and people living in surrounding communities.

108.     Defendants knew or should have known that their post-Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to exacerbate the damages to Plaintiffs and the wider community.

109.     Plaintiffs have a common right to enjoy their real property, free from dangerous contamination, to have clean air in and around their businesses, to have access to clean running water without dangerous levels of toxic chemicals, and to operate their businesses without unreasonable exposure to toxic chemicals.

110.     Defendants' improper transportation and handling of toxic and hazardous materials substantially and unreasonably infringed upon these public rights.

111.     As a direct and/or proximate result of Defendants' improper transportation and handling of toxic and hazardous chemicals, Plaintiffs' and the general public's common right to breathe clean air and have access to clean water without dangerous levels of toxic chemicals was severely diminished, if not entirely eliminated.

112.    As a direct and/or proximate result of Defendants' mishandling of toxic and hazardous materials, both before and after the Derailment itself, Defendants invaded and contaminated the areas surrounding Plaintiffs' businesses, thus exposing all employees and other users of Plaintiffs' property to toxic chemicals and carcinogens.

113.    Defendants' release of these toxic and hazardous materials also affects, and will continue to affect, the public at large, causing massive environmental damage to the surrounding area.

114.    Each of the Plaintiffs suffered injuries that are distinct from the public at large because their individual real and personal property rights have been unreasonably interfered with.

115.    Defendants' conduct is a substantial factor in creating a public nuisance and the public's exposure to toxic chemicals resulting therefrom.  Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value and inconvenience.

116.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT V – TRESPASS

117.    Plaintiffs incorporate by reference each and every allegation set forth above.

118.    Defendants, though their tortious conduct alleged herein, caused and/or allowed dangerous chemicals to enter and contaminate Plaintiffs' properties.

119.    Defendants knew or should have known that the chemicals being transported were hazardous and harmful to real property, animals, and individuals, and they were substantially

certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these toxic and hazardous materials would cause injury to Plaintiffs and their properties.

120.    Defendants knew or should have known that their post-Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to exacerbate the damages to Plaintiffs and the wider community.

121.    Defendants intentionally, knowingly, and/or negligently discharged and released highly toxic chemicals onto the properties of Plaintiffs.

122.    Defendants, through their activities alleged herein, authorized, requested or caused others to dispose of waste in a manner that they knew was substantially likely to cause hazardous materials to enter and contaminate Plaintiffs' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly and/or negligently caused hazardous materials to enter Plaintiffs' land and water.

123.    Defendants intentionally, knowingly, negligently, carelessly and/or recklessly caused a trespass in the following manners:

a.      by discharging – through the Derailment and resulting fires – pollutants, particulates, oily residue, and chemicals into the air, water and soils; and

b.      by allowing or causing such chemicals to discharge, seep or migrate underground in such a manner that it was reasonably foreseeable that the toxic materials would, in due course, invade Plaintiffs' real property and cause physical injury to that property.

124.    At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' right to enjoy the safe use of their property and environment.

125.    Defendants' conduct invaded the real property of Plaintiffs and interfered with their possessory interests of that property.

126.    The discharge of toxic and hazardous materials onto the real property of Plaintiffs caused physical damage to their property by casting over their property a plume of offensive

emissions and pollutants, depositing chemical residue on their businesses, causing damage to their buildings and landscaping, and invading their real property with a nauseating smell over a continuous and sustained period of time.

127.    The discharge of toxic and hazardous materials caused Defendants to enter, invade and intrude on the real properties of Plaintiffs without their privilege, permission, consent, authorization, invitation or justification.

128.    Defendants' intentional, knowing and negligent contamination – and continuing contamination – of Plaintiffs' real and personal property with toxic and hazardous materials has interfered with their rights to use and enjoy their property, constituting trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

129.    Defendants' trespass has also interfered with, and continues to interfere with, Plaintiffs' ability to use and enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property to operate their businesses or in any other manner that Plaintiffs so choose.

130.    As a direct and/or proximate result of Defendants' intentional, knowing, and negligent discharge of highly toxic and hazardous chemicals into Plaintiffs' properties, Plaintiffs are entitled to damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, the cost to repair the damage and restore the property to its pre-trespass condition, the costs of recovering possession of the property, business losses, and the value of their lost use of the property as a result of all trespass and for Defendants' ongoing trespass.

131.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT VI – MEDICAL MONITORING

132.    Plaintiffs incorporate by reference each and every allegation set forth above.

133.    The subject Derailment, and the controlled explosion and burn – resulting from the Defendants' actions and inactions, as further described above – resulted in the release of proven hazardous substances into the surrounding air, surface soil, surface water and ground water.  The substances include but are not limited to vinyl chloride, phosgene, hydrogen chloride, dipropylene glycol, diethylene glycol, ethylene glycol monbutyl ether, polyvinyl, polypropyl glycol, isobutylene, butyl acrylates, petro oil and benzene.

134.    As a result, the individual Plaintiffs herein have been exposed to greater-than-normal background levels of hazardous chemicals and materials.

135.    As a proximate result of these exposures, the individual Plaintiffs have a significantly increased risk of contracting one or more serious latent diseases and/or respiratory diseases.

136.    Monitoring procedures exist that make the early detection of these serious latent diseases possible.

137.    These monitoring regimes are different than those normally recommended in the absence of such exposures.

138.    These monitoring regimes are reasonably necessary to protect the individual Plaintiffs according to contemporary scientific principles.

139. The individual Plaintiffs request that the Court establish a medical monitoring program, managed by court-appointed and court-supervised trustees, whereby the individual Plaintiffs will be monitored by physicians, and the medical data produced utilized for epidemiological or other scientific studies.

140. Establishing a court-supervised medical monitoring program will ensure that funds are reserved, available and used for medical monitoring, scientific studies and related activities, the details of which are to be determined by the Court after being advised by experts the Court deems appropriate.

141. Alternatively, the individual Plaintiffs should be awarded the quantifiable costs of such a monitoring program for the individual Plaintiffs to undertake.

**COUNT VII – WILLFUL AND WANTON CONDUCT**

142. Plaintiffs incorporate by reference each and every allegation set forth above.

143. Defendants owed Plaintiffs a duty to refrain from willful, wanton, reckless and outrageous conduct, and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety and well-being of Plaintiffs.

144. Upon information and belief, Defendants were aware that they were transporting materials that were highly toxic, carcinogenic, mutagenic and/or otherwise harmful to human beings, animals and the environment.

145. Upon information and belief, Defendants were aware that transporting, releasing and igniting substances that were highly toxic, carcinogenic, mutagenic and/or otherwise harmful to individuals, animals and the environment could result in unreasonably dangerous emission of toxic and hazardous materials into the surrounding communities.

146.     Defendants knew or should have known that at least one railcar was malfunctioning and/or on fire for at least 20 miles before the Derailment.

147.     Upon information and belief, Defendants violated 49 CFR § 215.115(a) for at least 20 miles by allowing a defective wheel bearing to remain in service before the Derailment.

148.     Defendants knew or should have known that their post-Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to unreasonably exacerbate the damages to Plaintiffs and the wider community.

149.     Despite this knowledge, and contrary to federal and standard industry practices and procedures, Defendants breached their duties as described in Count I above.

150.     Defendants' failures to exercise any care toward Plaintiffs, as described in Count I above and other respects, constitute willful, wanton, reckless and outrageous conduct, and demonstrate an utter indifference – and/or conscious disregard – for the Plaintiffs' businesses and properties, and to the health, safety and well-being of anyone using Plaintiffs' property.

151.     The failures to exercise any care toward Plaintiffs occurred under circumstances for which the probability of harm was great and the probability of harm was known to Defendants.

152.     Through their unreasonable and dangerous actions and omissions described above, Defendants intentionally deviated from a clear duty or definite rule of conduct, acted with a deliberate purpose not to discharge a duty necessary to safety, or purposely performed wrongful acts with knowledge and appreciation of the likelihood of resulting injury.

153.     As a direct and/or proximate result of Defendants' willful, wanton, reckless and outrageous transportation, emission, discharge, and release of toxic and hazardous materials near Plaintiffs' properties, Plaintiffs presently suffer, and will continue suffering in the future, real property

damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, and inconvenience.

154.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, jointly, severally and in-solido, providing the following relief:

1.    Economic and compensatory damages in amounts to be determined at trial;

2.    Punitive damages in amounts to be determined at trial;

3.    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

4.    The cost of past and future medical monitoring;

5.    Such other and further relief available and any relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues which may be so tried.

Respectfully submitted,

/s/ Ronald R. Parry
Ronald R. Parry (0038027)
STRAUSS TROY CO., LPA
150 East Fourth Street, 4th Floor
Cincinnati, OH  45202-4018
(513) 621-2120 – Telephone
(513) 629-9426 – Facsimile
E-mail:  rrparry@strausstroy.com
*Attorney for Plaintiffs*

17173155.34 - 115527.001

31